**Frank CARTER, Jr., Plaintiff,**

v.

**MERIDIAN AUTOMOTIVE SYSTEMS, INC., Defendant.**

**No. CIV.A.03–2208–CM.**

United States District Court, D. Kansas.

Oct. 7, 2004.

---

Brian J. Klopfenstein, Attorney at Law, Kearney, MO, for Plaintiff.

Cynthia M. Peterson, Ronald J. Kramer, Seyfarth Shaw, Chicago, IL, Michael A. Williams, Rosalee M. McNamara, Lathrop & Gage, LC, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

MURGUIA, District Judge.

Plaintiff alleges that defendant, his former employer, discriminated and retaliated against him in violation of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981; discriminated against him in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.;* and denied him rights under the Family and Medical Leave Act (FMLA), 29 U.S.C, § 2601 *et seq.* This matter is before the court on defendant's Motion for Summary Judgment (Doc. 45).

Also before the court is plaintiff's Motion to Substitute a Signed Copy of the Affidavit of Shawn Glover for the Unsigned Affidavit Submitted in Plaintiff's Suggestions in Opposition to the Motion for Summary Judgment (Doc. 52). Defendant filed no objection. Accordingly, the court grants plaintiff's motion.

### I. Facts [1]

Plaintiff, an African–American male, began his employment with defendant in May 2001 as a temporary employee. Defendant hired plaintiff as a regular employee in July 2001. Prior to plaintiff's employment, plaintiff attended at least one

---

**1.** In many instances, plaintiff's response brief fails to properly controvert defendant's facts, which are appropriately numbered and referenced to the record in support thereof. Local rule 56.1 requires that a party opposing a motion for summary judgment set forth each fact in dispute and refer with particularity to those portions of the record upon which it relies in disputing such factual contentions. D. Kan. Rule 56.1(b)(1). Accordingly, those material facts which plaintiff has failed to adequately controvert are deemed admitted for purposes of summary judgment. *Id.* 56.1(b)(2).

meeting, at which plaintiff signed a form acknowledging that he received a packet of policies and procedures, including defendant's rules and regulations, leave of absence policy, EEO worksheet and policy, and workplace harassment policy.

Plaintiff's employment began as a temporary production associate in the molding department on the third shift. Plaintiff claims that Kevin Ramsey, a non-supervisory processor in the molding department, told him that he had to learn how to cut top covers before he could be hired permanently. Plaintiff does not know whether or not the other white employees in molding were told that they had to learn to cut top covers before they could be hired permanently. According to plaintiff, Peggy Ivory, a white female, was the only employee in molding who did not know how to cut top covers before becoming a permanent employee. Plaintiff claims that Ivory told him that she did not have to learn to cut top covers before she was hired permanently. Ivory did not work on Ramsey's shift when she was hired permanently. All other employees in molding, including Brian Woodring, Rhonda Coleman and Leanne Moore, all of whom are white, knew how to cut top covers before they were hired permanently.

In the fall of 2001, Kevin Ramsey transferred to the second shift and Chad Vyrostek, a white male, became the lead man on the third shift. By this time, plaintiff, Ivory, and Sean Glover, a black male, were the only production associates on the third shift. According to plaintiff, in September 2001, Vyrostek asked plaintiff, then 48 years old, about his age. Plaintiff claims that Vyrostek also asked him if he could handle the work, and jokingly called him an old man Plaintiff contends that he did not find the joke incredibly amusing or funny. Plaintiff never complained to management about Vyrostek's comments.

Plaintiff claims that, at this time, he was stuck cutting top covers because Glover did not know how to cut top covers up to standard and Ivory did not know how to cut top covers at all. According to plaintiff, Glover typically worked on step assists, which was not as hard as top covers, and Ivory typically did air dams, which was not constant work. Plaintiff also asserts that Ivory was allowed to take longer breaks.

### Plaintiff's Voluntary Transfer to Power Washing

In March 2002, plaintiff applied for and was granted a transfer to the power washing department. At that time, Floyd Flippin, a white male, and Theodore Brown, a black male, were the only other employees in the power washing department. Flippin was the department lead man. As a lead man, Flippin was not a supervisor; he was an hourly employee.

Plaintiff claims that Flippin denied him assistance on March 28, 2002 when plaintiff became light headed and needed to leave the paint booth Plaintiff never complained to anyone in management about this incident. Plaintiff also claims that he and Flippin got into a shouting match in July 2002, after Flippin accused plaintiff of leaving a washer on Plaintiff further claims that he was required to work shifts totaling six days per week and twelve hours per day for an extended period of time. However, plaintiff does not dispute that all employees in the power washing department were sometimes required to work ten to twelve hour days, six days a week. Plaintiff further claims that Flippin and Teddy Brown slept in their cars while on the clock and that they did not work. Plaintiff never complained to anyone in management that Flippin and Brown slept in their cars while on the clock.[2]

2. Floyd Flippin was eventually terminated for sleeping on the job.

On August 11, 2002, plaintiff and Brown got into a verbal altercation Plaintiff claims Flippin witnessed the altercation but failed to intervene. On August 12, 2002, defendant suspended both plaintiff and Brown pending a full investigation of the incident. Upon conclusion of its investigation, defendant issued final written warnings to both plaintiff and Brown pursuant to its policy against workplace violence. Plaintiff alleges he was unfairly disciplined for the August 11, 2002 altercation. Plaintiff also believes he should not have been disciplined for the altercation and assumes Brown was not disciplined to the same extent he was disciplined; however, the record reflects otherwise. In any event, at no time did plaintiff ever complain to his supervisor, Stewart McCrary, or to defendant's operations manager, Tom Lewis, that Flippin treated him unfairly because of his race or age.

### Plaintiff's Reassignment to the Carrier Department

After the altercation with Brown, plaintiff expressed to Lewis and Westbrook that he was no longer comfortable working in the paint department with Brown. In response, Lewis and Westbrook reassigned plaintiff to an open first shift position in the carrier repair department. Plaintiff did not object to the transfer to the carrier repair, which became effective on August 26, 2002. Because plaintiff transferred from the third shift in power washing to the first shift in carrier repair, he initially lost the $.50 night shift differential. A few weeks later, on September 15, 2002, plaintiff's pay rate was increased by $.50.

Plaintiff alleges that, after he transferred to the carrier repair department, he found an anonymous note in his locker which stated "You Are On Your Way Out Colored Boy." On October 2, 2002, plaintiff allegedly found another anonymous note in his car with the words "Lazy black ass nigga." Plaintiff claims he took the second anonymous note to Guy Henry, the only manager present at the time, who upon seeing the note responded "we don't accept that here." Plaintiff was asked if he had any idea who wrote the note, to which plaintiff responded "no." Henry then told plaintiff that he would turn the note over to Westbrook to investigate. The author of the note was never identified. About a week after the second note, defendant posted a memorandum to all employees throughout the plant and reiterated its anti-harassment policy to all employees during staff or "tool box" meetings. Plaintiff never expressed to defendant that he was dissatisfied with the company's resolution of the note incident.

### Plaintiff's Transfer Back To The Molding Department

In October 2002, the employee who originally was awarded the first shift carrier repair position into which plaintiff had transferred exercised his right to come back to the position under defendant's job bid policy. Consequently, plaintiff was given the option of going back to the power washing department, moving to a second shift carrier repair position, or transferring back to molding. Plaintiff opted to transfer to an open first shift position in the molding department effective October 13, 2002.

In or around October 2002, plaintiff talked to Westbrook about family medical leave protection. Westbrook gave plaintiff FMLA paperwork and told plaintiff that he needed to turn in the required certification before he could be considered for FMLA leave. Shortly thereafter, in early November 2002, Westbrook left defendant's employment and was replaced by Dixie Bingham.

On December 3, 2002, around 9 or 9:30 a.m., plaintiff complained to his supervisor, Craig Casey, that he was suffering from

chest pains and that he needed to leave. According to plaintiff, Casey asked him to work until 11:00 a.m. Plaintiff left the plant at 11:00 a.m. and met with his physician, who admitted plaintiff to the hospital for observation.

On December 29, 2002, plaintiff was given a point on his attendance record for failing to come to work after he volunteered to do clean up work while the plant was shut down. While plaintiff claims only he and two other African–American employees (Nakenia McGee and Pam Philips) were given points for their absences, plaintiff identified other African–American employees (Earl Dozier and Ralpholdo Acostas) who were not assessed points for being absent during the plant shutdown. In any event, after plaintiff and other employees complained that they did not know they would be charged with an unexcused absence if they did not show up on this particular day, defendant removed the point from plaintiff's record.

On January 25, 2003, plaintiff applied for FMLA leave with defendant. On February 4, 2003, after plaintiff provided defendant with the requisite medical certification regarding his diagnosed hypertensive heart disease, defendant granted plaintiff intermittent leave under the FMLA. Thereafter, all of plaintiff's doctor visits were covered by FMLA.

Plaintiff alleges that defendant assessed a point on his attendance record for the day he took off work to obtain the medical certification that was signed by his physician on January 31, 2003.[3] However, defendant's time and attendance records indicate that, once plaintiff was granted FMLA leave, plaintiff's December 3 through 7, 2002, and February 3, 2003 absences were retroactively classified as FMLA days

Plaintiff also claims that defendant scheduled his lunch breaks at times when he could not eat, despite knowing that plaintiff suffered from hypertensive heart disease and high blood pressure, which required him to eat at a certain time to take his medication. However, the medical certification provided by plaintiff's physician did not contain any restrictions and, specifically, did not indicate any restrictions with respect to when plaintiff could take his medication. Plaintiff never provided defendant with any documentation reflecting any eating or medication restrictions.

Plaintiff further alleges that Jerry Otey, a non-supervisory lead man in the molding department, denied him vacation time in March 2003. At that time, plaintiff already had taken vacation days on January 10 and 13, 2003, and February 7 and 10, 2003. Plaintiff further alleges that Otey would not allow him to take the entire day off to attend his uncle's funeral. Plaintiff never complained to anyone in management that he was denied either vacation or funeral leave.

**Plaintiff's August 2003 Suspension**

On July 29, 2003, Gael Rasa, defendant's safety officer, observed plaintiff on the plant floor without his mandatory head protection. This was a violation of defendant's health and safety policy, which is included in the Associate Handbook. Doug Scott, defendant's operations manager, told plaintiff to wear his safety hat and to provide a doctor's statement if his medical condition prevented him from wearing the head protection. Plaintiff did not receive a written discipline for this safety violation. The record reflects that other employees in the molding department, including Kenneth Hardridge, Kep Porter,

---

**3.** It appears from defendant's time and attendance records that, while plaintiff's physician signed FMLA paperwork on January 31, 2003, plaintiff was in fact not absent on that date.

and Nakenia McGee, have been disciplined for safety code violations.

On August 5, 2003, plaintiff brought a camera to work for the purpose of taking pictures of other employees allegedly violating the safety policy. In so doing, plaintiff violated defendant's corrective action policy, which prohibited employees from bringing cameras into the plant without permission from management. This policy is included in the Associate Handbook. As a result of his actions, plaintiff was placed on a three-day suspension.

On September 24, 2003, plaintiff left a note in the molding department, indicating that he was taking emergency vacation leave to spend time with his son Plaintiff was not approved for leave on September 24 because he did not give twenty four hour notice; however, plaintiff was granted vacation leave for September 25, 26 and 29. Plaintiff never returned to work; he resigned from defendant's employment on September 30, 2003.

**Plaintiff's EEOC Filing**

On September 25, 2002, plaintiff submitted a questionnaire to the Equal Employment Opportunity Commission (EEOC). The questionnaire was neither verified nor signed under oath by plaintiff. Plaintiff asserts that he believes he signed the questionnaire.

On January 7, 2003, the EEOC sent plaintiff correspondence, informing plaintiff that the information he had submitted to date had not been filed as a charge, and that additional information was needed to determine the nature and scope of an investigation, if any, into his allegations. Plaintiff apparently did not respond, as plaintiff testified that the questionnaire was the only paperwork he filled out with the EEOC. On January 31, 2003, the EEOC issued a dismissal and notice of rights to plaintiff. Plaintiff's EEOC file does not include a written charge of discrimination, nor is there an indication that

defendant received notice of plaintiff's complaint to the EEOC before the January 31 letter was issued.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."

*Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. Title VII and ADEA

 Exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under Title VII and the ADEA. *See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1326 (10th Cir.1999) (Title VII); *Creason v. Seaboard Corp.,* 263 F.Supp.2d 1297, 1309 (D.Kan. 2003) (ADEA). To exhaust administrative remedies, a plaintiff generally must present his claims to the EEOC as part of a timely filed EEOC "charge" for which he has received a right-to-sue letter. *See Simms,* 165 F.3d at 1326. The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices

complained of," *id.* § 1601.12(b). Requiring a plaintiff to have first presented his claims in an EEOC charge before being allowed to bring suit serves the dual purposes of ensuring the EEOC has the opportunity to investigate and conciliate the claims and of providing notice to the charged party of the claims against it. *Seymore v. Shawver & Sons, Inc.,* 111 F.3d 794, 799 (10th Cir.1997).

It is undisputed that plaintiff submitted a questionnaire to the EEOC on September 25, 2002. It is also undisputed that the plaintiff's questionnaire was neither verified nor signed under oath.[4] On January 7, 2003, the EEOC wrote plaintiff a letter informing him that the information he had submitted thus far had not been filed as a charge and that he needed to schedule an interview with the EEOC if he wished to pursue the matter further. Notwithstanding, there is no evidence in the record that plaintiff ever filed a verified charge of discrimination with the EEOC.

The court concludes that the submission of this intake questionnaire is insufficient to constitute the filing of an administrative charge. The charge of discrimination is "the primary, and usually the only, place to which courts look to determine whether a plaintiff timely and properly exhausted her claims before the EEOC. Because it is the only document that must be sent to the charged party, it is the only document that can satisfy the notice requirement." *Welsh v. City of Shawnee,* 182 F.3d 934 (1999). Plaintiff never filed a formal charge, and the questionnaire plaintiff submitted was neither signed nor verified. As such, the submission of this document is not sufficient to constitute exhaustion of administrative remedies for purposes of

---

4. Plaintiff attempts to create an issue of fact by stating in his affidavit, "It is my belief that I returned to the EEOC office to sign the Questionnaire alleging the action against [de-

fendant]." (Carter Affidavit ¶ 3). However, upon review of the Questionnaire at issue, it is clear it was neither signed, much less verified, by plaintiff.

Title VII and ADEA. *See also McCall v. Bd. of County Comm'rs of Shawnee*, 291 F.Supp.2d 1216, 1222 (D.Kan.2003). The court grants summary judgment to defendant on plaintiff's Title VII and ADEA claims.

### B. 42 U.S.C. § 1981

#### a. Hostile Work Environment

The court has determined that plaintiff failed to exhaust his administrative remedies as required by Title VII and the ADEA. However, 42 U.S.C. § 1981 does not require exhaustion. The court therefore turns to plaintiff's claim that he was subjected to a racially hostile environment in violation of § 1981.

To establish a prima facie case of hostile work environment harassment, a plaintiff must show that, "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998) (quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994)). A showing of pervasiveness requires "more than a few isolated incidents of racial enmity." *Bolden*, 43 F.3d at 551. A plaintiff must produce evidence to show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult ... sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

■ The record reflects that plaintiff cannot establish pervasive and severe harassment such that the terms and conditions of his employment were altered. In support of his racially hostile work environment claim, plaintiff alleges the following: (1) Ramsey told plaintiff that he had to learn to cut top covers before he could be hired permanently but that at least one Caucasian employee became permanent without learning how to cut top covers; (2) Caucasian employees were allowed to take longer breaks than African–American employees; (3) Flippin took no action to stop the August 11, 2002 altercation between plaintiff and Brown; (4) Brown was treated more favorably than plaintiff in response to the August 11, 2002 altercation; (5) upon returning to work from his suspension, plaintiff discovered a racially derogatory note in his locker; (6) upon returning to work from his suspension, plaintiff was transferred from the power washing department to the carrier repair department, resulting in a pay differential of $.50 per hour; (7) on October 2, 2002, plaintiff found a racially derogatory note in his car; (8) defendant took no action in response to the racially derogatory note which plaintiff reported; (9) plaintiff was transferred in October 2002 from the carrier repair department to the molding department, losing an additional $.50 per hour; (10) Craig Casey would not allow plaintiff to leave work immediately after plaintiff informed him that he was suffering from chest pains; (11) plaintiff was given a point on his attendance record for failing to come to work on a day in which he volunteered to do so while the plant was shut down; (12) Otey denied him vacation and funeral leave in the spring of 2003; and (13) plaintiff received an informal verbal warning for failing to wear a safety hat.

Even viewing all factual inferences in plaintiff's favor, these allegations fall woefully short of establishing an actionable hostile work environment for two reasons. Foremost, most of the conduct about which plaintiff complains bears no relation to plaintiff's race. Moreover, as for any conduct arguably attributable to plaintiff's race, such conduct does not rise to the

level of severity or pervasiveness required to be actionable under summary judgment standards.

Several of the incidents detailed by plaintiff involve Flippin. The court concludes that the series of clashes between Flippin and plaintiff "reflect a series of disagreements, perceived slights and philosophical differences that commonly occur in the workplace, regardless of the [races] of the individuals involved." *Unrein v. Payless Shoesource, Inc.*, 51 F.Supp.2d 1195, 1205 (D.Kan.1999). With respect to the incidents involving Flippin's alleged favorable treatment of Brown,[5] the court points out that Brown also is African American and, as such, the court finds that, in these circumstances, there is no evidence supporting plaintiff's allegation that Flippin's actions were racially motivated. Also significant to the issue of defendant's liability is the fact that plaintiff never complained to a member of management that he believed Flippin treated him unfairly based upon his race.

Plaintiff also complains that defendant transferred him to the carrier repair department in August 2002 at a lower rate of pay, and transferred him back to the molding department in October 2002 at a lower rate of pay. However, it is undisputed that, after the altercation with Brown, plaintiff expressed to management that he was no longer comfortable working in the paint department with Brown. Without objection from plaintiff, defendant reassigned plaintiff to an open first shift position in the carrier repair department. And because plaintiff transferred from a third shift position into a first shift position, he lost the $.50 night shift pay differential. However, plaintiff received a $.50 increase in his hourly rate on September 10, 2002, just a couple of weeks after he transferred

to carrier repair. Plaintiff presents no evidence to support the notion that defendant's decision to transfer him to carrier repair was racially motivated.

With respect to plaintiff's transfer from the carrier repair department to the molding department in October 2002, plaintiff concedes that the employee who originally occupied the carrier repair position exercised his right to come back to the position under defendant's job bid policy. Management gave plaintiff the option of going back to the power washing department, moving to a second shift carrier repair position where he would have been entitled to second shift differential pay, or transferring back to molding. Plaintiff opted to transfer to an open first shift position in the molding department, which resulted in a $.50 decrease in his pay rate. The evidence in the record simply does not support a finding that defendant's decision to transfer plaintiff to the molding department was motivated by race.

Plaintiff further complains that on December 3, 2002 his supervisor, Casey, would not let him leave work immediately after he complained that he was suffering from chest pains. However, plaintiff fails to present any evidence to suggest that this particular incident was racially motivated or that other non-minority employees were treated differently under similar circumstances. Likewise, there is no evidence that Otey's decision to deny plaintiff vacation and funeral leave in the spring of 2003 was motivated by racial animus. Plaintiff claims that Otey told him in March 2003 that he could not take any more vacation, but that other employees were allowed to take vacation. The undisputed record evidence establishes, however, that plaintiff already had taken

---

**5.** It appears from the record that Brown was not in fact treated more favorably; defendant issued three-day suspensions to both plaintiff and Brown and also issued both parties final written warnings as a result of their conduct.

vacation days on January 10, January 13, February 7 and February 10. Moreover, plaintiff has not identified any employee defendant treated more favorably with respect to vacation or funeral leave.

The court next considers plaintiff's claim that defendant assessed a point against his attendance record in December 2002 when plaintiff failed to come to work during a plant shutdown. Plaintiff contends that defendant did not treat other employees in the same fashion. Yet, while plaintiff claims only he and two other African–American employees were given points for their absences, plaintiff identified other African–American employees who were not assessed points for being absent during the plant shutdown. Moreover, the undisputed evidence in the record establishes that, once plaintiff complained to Dixie Bingham that he did not know he would be charged with an unexcused absence during a plant shutdown, Bingham immediately expunged the unexcused absence from his attendance. There simply is no evidence that this particular incident was racially motivated.

Plaintiff also complains that he was verbally warned for not wearing a safety helmet. Plaintiff does not dispute that he was in fact not wearing a safety helmet in violation of defendant's health and safety policy. Moreover, plaintiff comes forward with no evidence that other non-minority employees were allowed to violate safety regulations without being disciplined. These allegations do not support plaintiff's claim that he was subjected to a racially hostile work environment.

The court next turns to those allegations regarding top covers. Specifically, plaintiff complains that he was told by a non-supervisory employee in the molding department that he had to learn to cut top covers before he could be hired as a regular employee. In support of this allegation, plaintiff identified one white employee, Ivory, whom he claims was not held to this requirement. Yet, plaintiff testified that all of the other white permanent employees in the department knew how to cut top covers.

Plaintiff further complains that he was forced to take exact 15–minute breaks, while Ivory was allowed to take longer breaks. However, plaintiff himself explained that, unlike the work he performed, the work Ivory typically performed allowed her greater freedom to leave her work station. As such, plaintiff's allegations do not support a hostile work environment claim. In sum, plaintiff sets forth no evidence, apart from his own speculation, that defendant or its employees were motivated to undertake any of the above incidents as a result of racial animus.

The court now turns to those allegations which involve the racially derogatory notes. Specifically, plaintiff alleges that, after he transferred to the carrier repair department on August 26, 2002, he found an anonymous note in his locker, which stated "You Are On Your Way Out Colored Boy." A few weeks later, on October 2, 2002, plaintiff allegedly found another anonymous note in his car with the words "Lazy black ass nigga."

The court does not condone, and indeed views with distaste and disgust the contents of these notes. However, the court cannot find that, as a matter of law, these two incidents created a hostile work environment. At most, plaintiff has made a showing of "a few isolated incidents of racial enmity" insufficient to establish a hostile work environment claim. *See Bolden*, 43 F.3d at 551 (finding that, where evidence showed that two of plaintiff's co-workers made overtly racial remarks, including warning plaintiff that they knew people in the Ku Klux Klan, using the term "nigger" in plaintiff' presence, and

drawing an arguably racist cartoon, such conduct was not pervasive and thus not actionable racial harassment).

Even if plaintiff could establish an actionable hostile work environment claim based on the two alleged derogatory notes, the court concludes that defendant took prompt remedial action in response to plaintiff's complaint. Plaintiff showed management the October 2, 2002 note which, as best the court can discern from the record, was the first time plaintiff complained to management about any racially motivated incident.

Plaintiff does not dispute that defendant began investigating the October 2, 2002 note on the same day that plaintiff brought it to management's attention. Moreover, when asked whether plaintiff knew who authored the note, he responded that he did not. Indeed, the author of the note was never identified. As such, defendant chose to reaffirm its antiharassment policy and complaint procedure by posting a memorandum to all employees throughout the plant and reiterating the policy to all employees during staff or "tool box" meetings. In fact, plaintiff never received another racially derogatory note, nor was he subjected to racial slurs or comments of any sort after defendant posted and reiterated its anti-harassment policy in October 2002.

Defendant's response was both timely and "reasonably calculated to end the harassment," *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir.1998), and the court finds that no reasonable jury could find otherwise. The court grants defendant's summary judgment motion on plaintiff's hostile work environment claim.

### b. Retaliation

To establish a prima facie case of retaliation, plaintiff must show that: (1) he engaged in protected opposition to discrimination; (2) defendant subjected him to an adverse employment action subsequent to the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *Pastran v. K–Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir.2000). Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. If defendant presents evidence of a legitimate business reason, the plaintiff must then be allowed to demonstrate that the defendant's offered reasons are a mere pretext for discrimination. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir.1996).

The court first turns to the issue of whether plaintiff engaged in protected activity. As an initial matter, not every complaint constitutes "protected activity." *Robbins v. Jefferson County Sch. Dist. R–1*, 186 F.3d 1253, 1260 (10th Cir.1999). Rather, in order to allege protected activity, plaintiff must present evidence showing defendant knew that his concern or complaints related in some way to race and that he claimed being discriminated against on that basis. *Crumpton v. St. Vincent's Hosp.*, 963 F.Supp. 1104, 1119 (N.D.Ala.1997).

██ Foremost, the court does not construe plaintiff's alleged complaint to defendant, which stated that he felt intimidated and threatened by Brown (another African–American employee) after their August 11, 2002 altercation, as "protected activity" for purposes of retaliation. Indeed, there is no evidence in the record that plaintiff complained to management that Brown threatened him because of his race and, as such, plaintiff's claim that defendant retaliated by doing nothing to protect him after the August 11, 2002 altercation and treating him worse than Brown is meritless.

██ The first time plaintiff's conduct could be construed to constitute protected activity was plaintiff's complaint about the October 2, 2002 note.[6] Notwithstanding, plaintiff's claim that defendant reassigned him to different shifts with lower pay for reporting racial harassment is baseless. Plaintiff himself testified that he found the derogatory notes and complained about them *after* he returned to work from suspension and had been reassigned from the paint department to the carrier repair department in August 2002.

With respect to plaintiff's October 2002 transfer to the molding department, plaintiff does not dispute that the employee who originally was awarded the first shift carrier repair position into which plaintiff had transferred exercised his right to come back to the position under defendant's job bid policy. Accordingly, plaintiff has failed to set forth any evidence that a causal connection exists between the reporting of the note and his transfer to the molding department.

██ Plaintiff also alleges that his August 5 through August 7, 2003 suspension was in retaliation for filing the current lawsuit on April 28, 2003. While plaintiff arguably satisfies the first two elements of a prima facie case, plaintiff has presented no evidence to establish a causal connection between defendant's receipt of the notice of this lawsuit and its decision to suspend plaintiff over three months later.

However, for purposes of this opinion, the court will assume the timing of the lawsuit in relation to plaintiff's suspension establishes a causal connection. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1240–41 (10th Cir.2004) (concluding that a period of two to three months between the protected activity and the alleged retaliatory action was close enough to establish a prima facie case of causation). The court therefore turns to defendant's proffered reason for the adverse employment action. Defendant asserts that plaintiff was issued a verbal warning for failing to wear mandatory head protection on the plant floor.[7] Defendant proffers that plaintiff was then suspended for bringing a camera into the plant in violation of defendant's corrective action policy.

Defendant has presented evidence of a legitimate business reason for suspending plaintiff. Plaintiff must therefore demonstrate that the defendant's offered reasons are a mere pretext for discrimination. Most significant to the court is the fact that plaintiff does not dispute that he violated company policy by bringing a camera into the plant. Plaintiff presents no evidence that defendant's proffered reason is unworthy of belief. The court grants summary judgment to defendant on plaintiff's retaliation claim.

### C. FMLA

The FMLA requires that eligible employees be given twelve weeks of leave during any twelve month period because of a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also provides for certification requirements to enable an employer to verify the existence of a serious health condition. *Id.* § 2613. Employers are specifically prohibited from interfering with an employee's rights under the FMLA or discriminating against

---

6. The court assumes, without deciding, that reporting the note constitutes protected activity.

7. This informal verbal warning plaintiff does not rise to the level of a materially adverse employment action sufficient to satisfy the second prong of the *prima facie* retaliation case. *See Sanchez v. Denver Pub. Schools,* 164 F.3d 527, 533 (10th Cir.1998).

an employee who has exercised such rights. *Id.* § 2615(a).

In his response, plaintiff only briefly states his position regarding his FMLA claim: "Plaintiff believes that he was additionally discriminated on the basis of his age and FMLA claim, but that he didn't report the situation to his supervisor or that it only occurred on 1–2 occasions." (Plaintiff's Response at pg. 16). Plaintiff has failed to adequately set forth the discriminatory conduct in which defendant allegedly engaged and, more importantly, has failed to point to any evidence in support of this claim. The court therefore looks to the Pretrial Order, wherein plaintiff asserts that "Defendant denied plaintiff leave under the FMLA." (Pretrial Order at pg. 13).

 To the extent plaintiff alleges that defendant continued to schedule his lunch breaks at times when plaintiff could not eat because of his medication, plaintiff's claim fails. Plaintiff concedes that he never made defendant aware of any medical restrictions that required him to take his medication at a certain time or to eat a hot meal when taking his medication, nor did his physician ever provide for any such restrictions.

The court also addresses plaintiff's allegation that defendant assessed points on his attendance record for the day he took off work to obtain the medical certification that was signed by his physician on January 31, 2003. According to the record, plaintiff requested FMLA leave on January 25, 2003. On February 4, 2003, after plaintiff provided defendant with the January 31, 2003 medical certification, plaintiff was granted intermittent leave under the FMLA. At no time between January 24, 2003, when plaintiff requested FMLA leave, and February 4, 2003, when he was granted intermittent leave, was plaintiff assessed points on his attendance record. There is no evidence in the record that

defendant denied plaintiff FMLA leave and, as such, defendant in entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 45) is granted in its entirety. This case is hereby dismissed.